IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LUXOTTICA GROUP, S.p.A., an     :
Italian Corporation     :
    :
      Plaintiff,     :
    :
v.     :
    :
GREENBRIAR MARKETPLACE II,     :     CIVIL ACTION NO.
LLC, et al,     :     1:15-cv-01382-AT
    :
      Defendants.     :

## ORDER

This is a trademark infringement case brought pursuant to the Lanham Act. Plaintiff Luxottica Group, S.p.A. ("Luxottica") seeks to hold Defendants Greenbriar Marketplace II, LLC, and Albert Ashkouti liable based on a claim of contributory infringement.

Luxottica manufactures, markets, and sells premium, luxury and sports eyewear under various proprietary trademarked brands including Ray-Ban and Oakley. Luxottica does not offer its merchandise for sale through individuals, street vendors, unauthorized retail locations, or flea markets. According to its Complaint, Luxottica operates over 7,000 retail stores, including LensCrafters, Pearle Vision, and Sunglass Hut. Defendants are each alleged to be owners and operators of the Greenbriar Discount Mall, an indoor flea market near Greenbriar Mall in Fulton County. Luxottica asserts that certain vendors at the Greenbriar

Discount Mall have sold and continue to sell an array of counterfeit goods, including "knock-off" Ray-Ban and Oakley sunglasses.

On December 19, 2013, the United States Department of Homeland Security and the Atlanta Police Department raided the Greenbriar Discount Mall and the adjacent Greenbriar Strip Plaza and seized thousands of counterfeit products, including counterfeit Ray-Ban and Oakley merchandise.  Luxottica's investigators observed sales of fake Ray-Bans and Oakleys (also known as "FOakleys" or "faux-kleys") and were able to purchase several pairs of counterfeit sunglasses ranging in price from $10.00-$20.00 on multiple undercover trips to the flea market from October, 2014 to April, 2015.  Luxottica sent a cease and desist letter addressed to the "Owner/Manager" of the "Greenbrier Strip Plaza Warehouse" on January 9, 2015, notifying them that tenants at the Greenbrier Strip Plaza Warehouse were trafficking in counterfeit Ray-Ban and Oakley merchandise.

Luxottica seeks to hold Defendants as the owners and operators of the Greenbriar Discount Mall contributorially liable pursuant to the Lanham Act for the infringing acts of the individual vendors directly engaged in selling the counterfeit merchandise.  Defendant Greenbriar Marketplace II, LLC ("Greenbriar Marketplace") has moved for summary judgment [Doc. 62], arguing that as a mere property owner with no operational or managerial control over the Greenbriar Discount Mall, it is not liable for contributory trademark infringement as a matter of law.  Defendant Albert Ashkouti seeks summary

2

judgment [Doc. 82] in his favor because he personally had no authority or control over the vendors that allegedly infringed Luxottica's trademarks.

The Court held a hearing on Defendants' motions on September 15, 2016. After reviewing the parties' briefs and the evidence submitted, and with the benefit of oral argument, the Court's rulings are set forth below.

## I.    DISCUSSION

"The principles underlying the Lanham Act contemplate liability that extends beyond direct violators of the trademark provision of § 43(a)." *Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1276 (11th Cir. 2015) (citing *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 854 (1982)). Thus, under certain circumstances, "[l]iability for trademark infringement can extend beyond those entities that actually perform the acts of infringement." *Mini Maid Servs. Co. v. Maid Brigade Sys., Inc.*, 967 F.2d 1516, 1522 (11th Cir. 1992) (citing *Inwood*, "Thus, if a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one who it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorially responsible for any harm done as a result of the deceit.").

To succeed on a claim for contributory trademark infringement in the Eleventh Circuit, a plaintiff must first show that a third party in fact directly engaged in infringing conduct, and second, that the defendant contributed to that conduct either by knowingly inducing or causing the conduct, or by materially

participating in it.  *See Duty Free Americans, Inc.*, 797 F.3d at 1277; *Mini Maid Servs. Co.*, 967 F.2d at 1521-22.   Liability for contributory infringement necessarily depends upon whether the alleged contributing defendant "intended to participate" in the infringement or "actually knew about" the infringement. *Mini Maid Servs. Co.*, 967 F.2d at 1522; *see also Duty Free Americans, Inc.*, 797 F.3d at 1277. The extent and nature of the violations being committed may be relevant in making this determination.  *Mini Maid Servs. Co.*, 967 F.2d at 1522. "If the infringement is serious and widespread, it is more likely that" the defendant knows about and condones the infringing activity.  *Id.*

The plaintiff must also demonstrate that the defendant actively and materially furthered the unlawful conduct — either by inducing it, causing it, or in some other way working to bring it about (for example by directly controlling or monitoring the third party's conduct). *Duty Free Americans, Inc.*, 797 F.3d at 1277-78 (citing *1–800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1249 (10th Cir. 2013) (explaining that *Inwood* establishes liability for a defendant who "enables a third party" to violate the Lanham Act)).  "[U]nder appropriate facts, contributory trademark infringement might be grounded upon a [defendant's] bad faith refusal to exercise a clear contractual power to halt the infringing activities." *Mini Maid Servs. Co.*, 967 F.2d at 1522.

Several courts have extended liability for contributory trademark infringement to landlords, owners, and operators of flea markets and other locations where vendors sell counterfeit goods. *See, e.g., Hard Rock Cafe*

*Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1149-1150 (7th Cir. 1992) (applying *Inwood* liability test for contributory trademark infringement to the owner and operator of a flea market where counterfeit items were sold and finding that owner/operator, though lacking actual knowledge, had reason to know of trademark violations of its vendors and by "willfull blindness" deliberately failed to investigate suspected infringing activity by vendors, thereby facilitating ongoing infringement by permitting such vendors to use flea market resources may be subject to contributory liability); *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264-265 (9th Cir. 1996) (adopting *Hard Rock Cafe's* application of contributory trademark infringement liability to operators of a swap meet who had reason to know of infringing activity after law enforcement officers raided the flea market and seized counterfeit merchandise); *Coach v. Goodfellow*, 717 F.3d 498 (6th Cir. 2013) (holding that facts were sufficient to support a finding of contributory liability as to flea market operator, as "provider of a product or service, i.e., rental booths and storage units for vendors" who "continued to rent spaces at his flea market to vendors that he knew, or should have known, were engaging in infringing activity"); *Coach Inc. v. Swap Shop, Inc.*, 916 F. Supp. 2d 1271, 1279 (S.D. Fla. 2012) (holding that plaintiffs stated a facially plausible claim that owners and operators of a flea market were either willfully blind of Lanham Act violations or had actual knowledge of them, and were therefore liable for contributory trademark infringement); *Coach, Inc. v. Sapatis*, 994 F. Supp. 2d 192 (D.N.H. 2014) (finding the defendant's degree of

control over the infringer — rather than his or her nominative status as owner, lessor, or lessee — as the determinative factor and denying motion for summary judgment of individual owner and operator of flea market where the evidence viewed in the light most favorable to Coach indicated the defendant exercised sufficient control over the flea market and its vendors for a reasonable jury to hold him contributorily liable for the vendors' conduct).

Corporate officers can be held personally liable for contributory trademark infringement. *Babbitt Elecs. Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1184 (11th Cir. 1994) ("[A] corporate officer who directs, controls, ratifies, participates in, or is the moving force behind the infringing activity, is personally liable for such infringement without regard to piercing the corporate veil."); *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991) (stating that individuals, as well as corporations, may be liable for trademark infringement under the Lanham Act because obviously a corporation acts through an individual and if the corporation is responsible for infringement that infringement was done by someone, either an employee or an officer of the corporation).  The "individual liability standard does not ask whether the individual participated or engaged in some infringing act; instead, it asks whether he actively participated as a moving force in the decision to engage in the infringing acts, or otherwise caused the infringement as a whole to occur." *Chanel*, 931 F.2d at 1478 n. 8.

For purposes of their summary judgment motions, neither Defendant challenges Luxottica's assertion that vendors at the Greenbriar Discount Mall have engaged in the sale of counterfeit Ray-Ban and Oakley eyewear, nor do they contend that Luxottica cannot establish the predicate act of direct trademark infringement by these vendors.[1]  Defendants also do not argue in their motions that they had no knowledge of the alleged widespread sale of counterfeit merchandise at the discount mall/flea market.[2]  Instead, their arguments focus solely on the contention that these Defendants lack the requisite degree of control over the flea market and the infringing conduct at the flea market to be held liable for contributory trademark infringement.

A.    **Summary of Evidence Relating to Defendants' Ownership, Operation, and Control Over the Greenbriar Discount Mall**

Defendant Greenbriar Marketplace is the owner of  the real property located at 2975 Headland Drive S.W. in Atlanta, Georgia (the "Property"), which consists of a shopping center, comprised of a large anchor store space (a former Kmart) — the Discount Mall — and several other smaller retail storefronts, as

---

[1] *See Duty Free Americas Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1277 (11th Cir. 2015) (holding that to establish a contributory false advertising claim under the Lanham Act, the plaintiff must first, show that a third party in fact directly engaged in false advertising, and second, that the defendant contributed to that conduct either by knowingly inducing or causing the conduct, or by materially participating in it).

[2] At the summary judgment hearing, Defendants implicitly called into question whether they had received notice from Luxottica that counterfeit versions of its eyewear products were being illegally sold by Defendants' tenants.  This is because the cease and desist letter attached to (and referenced in) Luxottica's Complaint was directed at counterfeit sales at an adjacent shopping enter owned and operated by 2925 Properties and not at the Greenbriar Discount Mall located on the real property owned by Greenbriar Marketplace at 2975 Headland Drive, Atlanta, Georgia, part of which is leased and operated by 2925 Properties.

well as the adjoining parking lot areas and traffic medians.[3]   Greenbriar Marketplace leases a 95,810 square foot portion of the property and shopping center — the anchor store space and the adjoining parking lot areas — to Defendant 2925 Properties, LLC, for the operation of the Greenbriar Discount Mall ("flea market").   Greenbriar Marketplace engages in no other business than owning the shopping center and its only income is rent from tenants of the shopping center, including 2925 Properties.

Greenbriar Marketplace has two members: Tabas Two, LLLP and Kimberly Swindall.  Tabas Two owns a 50% interest in the profits and losses of Greenbriar Marketplace and a 51% interest in the capital contributions made over time to Greenbriar Marketplace.  Defendant Kimberly Swindall owns a 50% interest in the profits and losses of Greenbriar Marketplace and a 49% interest in the capital contributions made over time to Greenbriar Marketplace.

2925 Properties operates the Greenbriar Discount Mall at 2975 Headland Drive by subletting spaces to vendor/tenants in a "flea market" environment. (*See* Lease; *see also* Answer, Doc. 52 ¶ 7, admitting that 2925 Properties operates the Discount Mall business.) Kimberly Swindall, the co-owner of Greenbriar Marketplace, is also the sole member/owner of 2925 Properties.   Kimberly Swindall's husband, Patrick Swindall is the "manager" of 2925 Properties.   The breakdown of the ownership/membership structure of Greenbriar Marketplace and 2925 Properties is:

---

[3] The property is located behind Greenbriar Mall.



2925 Properties also owns and operates an adjacent property and shopping center at 2925 Properties Headland Drive, Atlanta, Georgia, referred to as the "Greenbriar Strip Plaza" and the "Shops of Greenbriar." The two properties and shopping centers are shown below, with the portion of 2975 Headland Drive leased by 2925 Properties shown in outline:



Defendant Albert Ashkouti, is not personally a direct owner or member of Greenbriar Marketplace. He is, however, indirectly involved by virtue of his ownership/membership in Tabas Holdings and Tabas Two. Mr. Ashkouti owns

67% of Tabas Holdings, which in turn owns 1% (and is the general partner) of Tabas Two.  Mr. Ashkouti is also a limited partner of Tabas Two.  According to the Affidavit he signed as a "representative duly authorized to testify on behalf Greenbriar Marketplace II, LLC," in support of Greenbriar Marketplace's motion, Ashkouti is also "a member of the general partner of Greenbriar Marketplace's majority member." (November 11, 2015 Affidavit of Albert Ashkouti ¶ 2.)  Mr. Ashkouti is also listed with the Georgia Secretary of State's office as the "registered agent" and identified himself as a "member/manager" for Greenbriar Marketplace, although he in fact is not personally a "member" of the LLC.  Mr. Ashkouti's basket of indirect business interests in Greenbriar Marketplace are summarized as shown below:



Kimberly Swindall, as both 50% owner of Greenbriar Marketplace and as sole owner and member of 2925 Properties, was aware of the December 19, 2013, law enforcement raid on the Greenbriar Discount Mall and adjacent Greenbriar Strip Plaza during which counterfeit Ray-Bans and Oakley sunglasses were seized from several individual vendors/tenants.  In an email sent that same day to J.D. Cannon of the Department of Homeland Security, Kimberly Swindall

acknowledged the seizure of counterfeit merchandise at both shopping centers. Swindall also separately acknowledged the counterfeiting problem in letters to other manufacturers whose counterfeit merchandise has also been sold at the Greenbriar Discount Mall.  The December 19, 2013 raid was not the first run-in with counterfeiting by Greenbriar and 2925 Properties, nor was it their last. Kimberly Swindall's efforts to combat the prevalent sale of counterfeit merchandise at the flea market both before and after the raid have been unsuccessful in ridding the flea market of all counterfeit sales.

2925 Properties (d/b/a Greenbriar Discount Mall) was Greenbriar Marketplace's largest tenant.   Their lease contains several limitations on 2925 Properties' use of the leased premises and provides Greenbriar Marketplace, as property owner and landlord, with various rights in the event its tenant, 2925 Properties does not comply with the lease terms:

(a) Section 4.1: provides that the "Premises shall not be used . . . in such a manner as to operate . . . in violation of any law, ordinance, regulation, . . . or governmental directives . . . ;"

(b) Section 4.6F: requires 2925 Properties to "[p]romptly comply with all laws, ordinances, rules and regulations of governmental authorities . . .;"

(c) Section 4.6H: requires 2925 Properties to "[o]bey and observe (and compel its officers, employees, contractors, licensees, invitees, sublessees, concessionaires and all others doing business with Tenant to obey and observe) and strictly comply with the Rules and Regulations established by Landlord from

time to time for the conduct of the Tenant and/or the welfare of the Shopping Center;"[4]

(d)  Section 6.1: provides Greenbriar Marketplace with the right to terminate the lease or perform any obligation of 2925 Properties if it fails to abide by the terms of the lease;

(e)  Section 6.1F: provides that "in the event of a breach or threatened breach by [2925 Properties] of any of the provisions of this Lease, [Greenbriar Marketplace] shall have the right of injunction and the right to invoke any remedy allowed at law or equity;"

(f)  Section 7.15: provides Greenbriar Marketplace the right to perform 2925 Properties' obligations and cure the 2925 Properties' defaults — "[i]f tenant shall at any time fail to perform any obligation of tenant under this Lease, Landlord shall have the right, but not the obligation, without waiving or releasing Tenant from any obligations it has under this Lease, to perform such obligation of Tenant in the manner that Landlord shall deem appropriate . . . ."

Although Greenbriar Marketplace argues it had no right or control over the use of the property, its lease also prohibited 2925 Properties from offering certain merchandise on the premises including alcohol, obscene, erotic or pornographic materials.  (Lease § 4.1.)   Under the terms of the lease, Greenbriar Marketplace also retained control over and was required to provide, operate, and maintain

---

[4] The lease thus authorized Greenbriar Marketplace to establish rules and regulations specifically relating to the sale of counterfeit merchandise in the shopping center and the conduct of 2925 Properties' tenants.

common areas and facilities at the property and within the shopping center including, parking areas, truck-ways and loading areas, delivery passages, and public restrooms.  (Lease § 1.6.)    Finally, the lease authorized Greenbriar Marketplace to terminate the lease of any tenant (including 2925 Properties) that has failed to comply with the law[5] or the provisions of the lease.

### B.    Whether Greenbriar Marketplace is Potentially Liable for Contributory Infringement

Greenbriar Marketplace argues on summary judgment that it is not liable for contributory trademark infringement as a mere property owner — even if infringing activities are shown to have occurred at the property it owns — because: (a) its tenant, 2925 Properties, is solely responsible for the operation, use, and management of the property, and (2) Greenbriar Marketplace has no right of control over the tenants under the Lease.  Greenbriar Marketplace's mantra is that under its lease, Greenbriar Marketplace does not control, cannot control, and does not have the right to control any of the tenants at the flea market. According to Greenbriar Marketplace, Luxottica cannot point to any evidence to show any actions taken by Greenbriar Marketplace or any individuals or entities acting on its behalf to participate in, or turn a willfully blind eye to, any trademark infringement, or to operate, manage, or control the property in such a manner as to be held liable as a contributory infringer.

---

[5] The Lanham Act clearly falls within the scope of this provision.

In support of its motion, Greenbriar Marketplace relies on two district court decisions, *Malletier[6] v. The Flea Market, Inc.*, 2009 WL 1625946, *3 (N.D. Cal. June 10, 2009) and *Coach, Inc. v. Swap Shop, Inc.*, 916 F. Supp. 2d 1271, 1278 (S.D. Fla. 2012), holding that that "[p]roperty ownership alone does not establish that [the property owner d]efendant exercised control over the sale of the infringing products."  But as the court acknowledged in the unreported *Louis Vuitton Malletier* case, on which the district court in *Swap Shop* piggy-backed, in determining whether a defendant is liable for contributory infringement by supplying a product or service to a third party (with knowledge of the infringing use) "the court 'consider[s] the *extent of control* exercised by the defendant over the third party's means of infringement." *Louis Vuitton Malletier,* 2009 WL 1625946, * 2 (citing *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 984 (9th Cir. 1999) and *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996)) (emphasis added); *see also Coach, Inc. v. Peter Sapatis, et al.*, 994 F.Supp.2d 192, 199-200 (D.N.H. Jan. 31, 2014).  Thus, the question is not whether Greenbriar Marketplace's status as a property owner gives rise to liability, the question is whether Greenbriar Marketplace had sufficient control

---

[6] Westlaw has misreported this case name by improperly abbreviating the name of the company *Louis Vuitton Malletier,* the plaintiff in the case against the Flea Market Inc.  *See* Rule 10.2.1(g) ("Generally, omit given names or initials of individuals, but not in names of business firms . . ."). Louis Vuitton Malletier, commonly referred to as Louis Vuitton, is a French fashion house founded in 1854 by Louis Vuitton. Malletier, which is not Louis Vuitton's last name, in French, means a trunk-maker, or manufacturer of luggage and suitcases.  The Court therefore refers to this case as the *Louis Vuitton Malletier* case.

over the "means" of infringement at the flea market such that it can be said to have facilitated the infringing activity.

Greenbriar Marketplace's blanket denials do not address the veritable "pandora's box" of issues relating to control over its property and its direct tenant, 2925 Properties.   A landlord may be held liable for contributory trademark infringement by continuing to lease space to a tenant whom it knows or has reason to know is engaging in trademark infringement even without direct control over the infringing conduct.  *See Inwood*, 456 U.S. at 854-55 (finding that a defendant is contributorially liable for the direct infringement of others if, *inter alia*, the defendant "continues to supply its service to one whom it knows or has reason to know is engaging in trademark infringement."); *Goodfellow,* 717 F.3d at 503-05 (holding that a flea market owner and operator who "provide[d] . . . rental booths and storage units for vendors" was contributorily liable when he had reason to know of trademark infringement committed by some vendors); *Fonovisa*, 76 F.3d at 265 (noting that "it would be difficult for the infringing activity to take place in the massive quantities alleged without the support services provided by the [flea market] . . . includ[ing], *inter alia*, the provision of space, utilities, parking, advertising, plumbing, and customers"); *Hard Rock*, 955 F.2d at 1148-49 (applying common law tort doctrines to claim for contributory infringement and stating that a landlord "is responsible for those it permits on its premises 'knowing or having reason to know that the other is acting or will act tortiously'"); *accord Mini Maid Servs.*, 967 F.2d at 1522 (noting that "under

appropriate facts, contributory trademark infringement might be grounded upon a franchisor's bad faith refusal to exercise a clear contractual power to halt the infringing activities of its franchisees"); *Duty Free Americas*, 797 F.3d at 1248 ("in determining whether  a plaintiff has adequately alleged facts to support [] a claim" for contributory liability under the Lanham Act, the court looks to "whether the defendant engaged in 'bad faith refusal to exercise a clear contractual power to halt'" the infringing activities).[7]   In the landlord-tenant context, "[t]he issue of proximity [between the defendant and the infringing vendors] . . . is related to the issue of control, which is a key component of the analysis." *Coach, Inc. v. Gata Corp.*, No. 10–CV–141–LM, 2011 WL 2358671, at *7-8 (D.N.H. June 9, 2011) (finding that "the operator of a flea market that rents spaces to vendors exercises substantial[ ] . . . control over potential direct infringers. . . .").

In arguing that the summary judgment evidence conclusively shows that Greenbriar Marketplace lacked the requisite control to establish contributory liability, Greenbriar ignores Kimberly Swindall's dual status as half-owner of Greenbriar Marketplace — the property owner and landlord — and as sole owner of 2925 Properties which operates the flea market.   Kimberly Swindall's ownership and direct management interests in both Greenbriar Marketplace and

---

[7] The Court notes in *Duty Free Americas* the Eleventh Circuit relied on the holdings of the Ninth Circuit in *Fonovisa* and the Seventh Circuit in *Hard Rock* to find that the Supreme Court's contributory liability doctrine in *Inwood* was not limited to the manufacturing/product context.

2925 Properties gives rise to a common identity between the landlord and its major tenant.

Oddly though, Luxottica did not seek to take the deposition of a Rule 30(b)(6) representative for Greenbriar Marketplace[8] or either of the Swindalls. Luxottica is thus proceeding on a slimly developed record on a clearly fact-determinative issue.  As long as there is *some* evidence, construed in Luxottica's favor, from which a reasonable jury could find Greenbriar Marketplace had the requisite control to be liable as a contributory infringer, it is not the Court's role to weigh the evidence in order to discount the extent of Greenbriar's control. Although there is no personalized flavor in the available record evidence regarding the extent of Kimberly Swindall's involvement in the day-to-day management of Greenbriar Marketplace absent her deposition testimony, there is some evidence to support the inference that Kimberly Swindall was a central and pivotal figure playing the role (on behalf of Greenbriar Marketplace and 2925 Properties) as both the owner and operator of the flea market. She maintains an office at the strip mall and is aware of the global counterfeiting problem as a

---

[8] Luxottica deposed Albert Ashkouti only in his personal capacity and asked him various questions about the management of Greenbriar Marketplace.  Mr. Ashkouti was extremely evasive, in part hiding behind the fact that he was not appearing in a representative capacity on behalf of Greenbriar at that time.  Mr. Ashkouti initially testified that he was the managing member of Greenbriar, but once his attorney interrupted by questioning whether he personally was a managing member, Mr. Ashkouti retreated from that position.  Mr. Ashkouti then indicated that he did not know who managed the day-to-day affairs of the entity Greenbriar Marketplace II, LLC, and denied knowing who (other than Tabas Two) were the other members of Greenbriar Marketplace.  He subsequently stated that a property management company — First Guaranty Management Company (of which Ashkouti is President) — manages Greenbriar's property.

whole.[9]  Mr. Ashkouti, in his deposition and correspondence, referred repeatedly to Mrs. Swindall's awareness and involvement in addressing the counterfeit activity at the flea market as well as in his communication to her husband Patrick Swindall regarding this topic.  (*See, e.g.*, Doc. 71-4 at 185-87.)

A reasonable jury could find from the various written correspondence in the record and her central financial and management leverage position that Kimberly Swindall was a point person for Greenbriar Marketplace, that she had direct knowledge of the sale of counterfeit Luxottica merchandise based on her knowledge of the arrests of certain vendors during the December 2013 raid, and the purported evictions of certain tenants based on those arrests.  A reasonable jury could conclude that Kimberly Swindall had the authority, on behalf of Greenbriar Marketplace, and the ability (as its direct equal member) to revoke the leases of the flea market vendors and her *own* (2925 Properties) lease as flea market operator.   A reasonable jury could also conclude that she refused to exercise that contractual right based on her common identity as property owner/landlord and tenant/flea market operator.  Swindall's actions as landlord on behalf of 2925 Properties inure to her benefit as an owner of Greenbriar Marketplace.  But a reasonable jury might also conclude that Kimberly Swindall

---

[9] While the Court recognizes that Defendants cannot be held liable to Luxottica for the infringing sale of counterfeit Burberry, Coach, or Louis Vuitton merchandise at the property, the evidence of the widespread counterfeiting problem at the flea market and Swindall's knowledge of the same is relevant to the consideration of her control (on behalf of both Greenbriar Marketplace and 2925 Properties).   *See Mini Maid*, 967 F.2d at 1522 (stating that if the infringement is serious and widespread, it is more likely that the franchisor knows about and condones the acts of its franchisees).

took reasonable efforts to flush out infringing sales of counterfeit merchandise at the flea market.

There is more than a scintilla of evidence, construed in Luxottica's favor, from which a reasonable jury could find Greenbriar Marketplace's actions in maintaining the physical space of the whole of the Shopping Center, including the Flea Market/Discount Mall, dictating leasing conditions for its tenant/occupants, continuing to lease, continuing to collect rent, refusing to take effective steps to stop the illegal counterfeiting activity is sufficient to give rise to contributory infringement liability.  Accordingly, Swindall's significant interlocking financial and operational ties to both Greenbriar Marketplace and 2925 Properties are fatal to Greenbriar's request for judgment in its favor as a matter of law that it is not contributorially liable for continuing to provide a marketplace for the sale of counterfeit merchandise.

### C.   Whether Albert Ashkouti is Individually Liable for Contributory Infringement

The link between Ashkouti, Greenbriar Marketplace, 2925 Properties and the flea market is far more attenuated, even if purposefully so molded.  Luxottica seeks to hold Ashkouti individually liable for the conduct of Greenbriar Marketplace as a contributory infringer of Luxottica's trademarks.   Mr. Ashkouti's savvy business structuring of his family's investment companies was clearly done to avoid opening him up to personal liability for his financial real

estate dealings.  On paper, Mr. Ashkouti is not directly involved in the ownership or "operation" of Greenbriar Marketplace.

Luxottica does not offer any documents or direct testimony as to Greenbriar's organizational structure and management.  Despite the evidence that Ashkouti is not personally a member or owner of Greenbriar Marketplace and despite his denials that he is an officer, director, or manager of Greenbriar Marketplace, Luxottica asserts that Ashkouti was the agent in control of Greenbriar, the only person that controlled Greenbriar's business and that "he, and no one else, was behind Greenbriar Marketplace's unwillingness to exercise Greenbriar Marketplace's clear contractual power under its lease agreement with 2925 Properties to halt the ongoing counterfeiting activities by terminating its lease agreement with 2925 Properties."  (Resp. at 13.)

Although Ashkouti claims to have almost no involvement in Greenbriar Marketplace, the record shows that he clearly maintained an active management role in Greenbriar Marketplace and portrayed this management role to those he dealt with on its behalf.  Based on the limited evidence Luxottica has provided as to Greenbriar's actual corporate structure, Ashkouti appears to function as an "agent" of Greenbriar in the formal legal realm as well as in reality, whether or not he is denominated in this way by the formal corporate ownership structure. He does represent himself as a member of Greenbriar at various points but there is no actual documentation of his ownership interest beyond his limited 12% interest in Tabas Two, LLLP and indirectly through holding his interest in Tabas

Holdings LLC.  The evidence shows that for all practical purposes over the course of years, he extended himself as a manager/owner/partner/representative of Greenbriar Marketplace II.  (*See* Secretary of State filings; tax filings; affidavit filings in this case, correspondence, 2009 state court complaint re back rent due; settlement agreement on rent.)

Luxottica contends that there is no evidence to suggest that Ashkouti delegated the tasks of managing Greenbriar Marketplace to anyone else. But the evidence indicates his personal interest in Greenbriar Marketplace is a purely limited financial interest[10] and he does appear to exercise direct control over the money coming in and out of the business.  With respect to the "operation" or "management" of the property, Ashkouti visited the shopping center once in 2004 when Greenbriar purchased the property, and only once thereafter, but he never went inside.   Instead, he employs another company (albeit his own property management company) to manage the Greenbriar property as a whole. He did not personally have an office at the Greenbriar shopping center; and, he did not regularly patrol the premises or his tenants at the shopping center for lease compliance issues.   He relied on Greenbriar's property management company and the Swindalls to handle all other affairs concerning Greenbriar and its lessees.

Luxottica's evidence further demonstrates that Ashkouti unquestionably disavows any direct interest in the portion of the shopping center leased by

---

[10] Again, Ashkouti's personal interest is solely through his 12% interest in Tabas Two.  His family members own the remaining percentage interests in Tabas Two.

Greenbriar to 2925 Properties.   For all practical purposes, Mr. Ashkouti delegated all issues involving the flea market and complaints regarding counterfeiting to Patrick and Kimberly Swindall.  Luxottica has not offered any evidence that Ashkouti had any personal involvement with the flea market, or that he personally observed or monitored the vendors at the flea market. Whenever he received complaints (via written correspondence and telephone calls) regarding the counterfeiting at the flea market, he wrote a responsive letter to the complainant, referred the matter to the Swindalls, and relied on them to deal with it either on behalf of Greenbriar or 2925 Properties.[11] While he met with representatives of Homeland Security on one occasion, he complained that the department was harassing him, trying to put him out of business, and that he didn't have any rights over the flea market vendors that the department had failed to arrest or take any other action against. (Ashkouti Dep. at 184-86.)

Luxottica's reliance on *Goodfellow*, 717 F.3d 498 (6th Cir. 2013) and *Sapatis*, 27 F. Supp. 2d 192 (D.N.H. 2014) is not persuasive.  In both of those cases, the individual was the *de facto* owner or operator of the flea market.  In *Goodfellow*, Travis Goodfellow owned and operated The Southwest Flea Market as a sole proprietorship.   He controlled, managed, oversaw the day-to-day operations of the flea market, and had the ultimate authority in allowing and removing vendors who sold goods at the flea market.  Goodfellow held meetings

---

[11] In fact, he testified that he was only aware of the raid on the flea market because he saw it on television.

22

with vendors and took remedial measures, such as personally distributing pamphlets to vendors.

In *Sapatis*, Peter Sapatis owned property at which he operated the Londonberry Flea Market (first as a sole proprietorship and then as sole owner of Londonberry Marketplace LLC) until 2008 when he "sold" the flea market business and leased the premises to his daughter.  Though he claimed to be retired, Sapatis continued to operate the flea market concession stand and assisted his daughter in the operation of the flea market.  The flea market's business office and telephone line were located in Sapatis's home located adjacent to the flea market.  In that regard, Sapatis was on-site daily and regularly patrolled the flea market, was the flea market's point of contact for customer emails and telephone calls, leased spaces to vendors, informed vendors about flea market policies he had developed, and never corrected third parties who referred to him as the flea market's owner.  Sapatis performed and controlled many vital aspects of the flea market's operations including bookkeeping, groundskeeping, provision of supplies, and financial decision-making, and personally drew rent payments directly from customer admission fees and vendor rent payments.

Faced with a barren evidentiary record that holds no resemblance to the other cases on which a basis for individual liability was found, Luxottica travels on the lease agreement (which does not give Ashkouti the personal right to take action against 2925 Properties) and Ashkouti's evasive and conflicting deposition

23

testimony.   Luxottica could potentially have satisfied its summary judgment burden had it offered testimony via the Swindalls or other witnesses regarding Ashkouti's greater involvement (on behalf of Greenbriar) with 2925 Properties in the oversight of the flea market.  But Luxottica offers only evidence that Ashkouti was aware that sale of counterfeit goods was recurring at the flea market — involving a variety of trademark products in volume; that Greenbriar Marketplace could have terminated the lease of 2925 Properties on these grounds, for unlawful activities but did not; and that Greenbriar Marketplace supplied overall services for the mall, though some of these services are provided directly by 2925 Properties.  This record reflects Ashkouti's potential to exercise control over 2925 Properties, a potential/plausible contributory infringer.  But control over a contributory infringer in this way (not the actual infringer) — without evidence of more extensive intermingling of Ashkouti and Greenbriar with 2925 Properties' management/direction of the flea market as is present in *Sapatis* etc. — does not provide an adequate basis for Ashkouti's individual liability.    While there are indicia that Ashkouti [and Greenbriar] were functioning, often hand in glove with 2925 Properties and its owner (who shared interlocking financial interests), to maximize profit for the Greenbriar property as a whole, there is insufficient evidence upon which a reasonable jury could rely in finding that Ashkouti (on behalf of Greenbriar) effectively oversaw/facilitated or actively participated as a moving force in contributing to the flea market's

operation in the way that the occurred in *Sapatis* and other property owner contributory trademark infringement cases.  *See Chanel*, 931 F. 2d at 1477-1478.

Luxottica argues that "[t]he fact is that Ashkouti, as the agent in control of Greenbriar Marketplace, participated in the decisions, or, more succinctly, the failure to render decisions and the failure to take appropriate action, of Greenbriar Marketplace," and "[i]n that respect, Ashkouti was the moving force behind Greenbriar Marketplace's contributory infringement of Luxottica's trademarks." (Resp. at 13.)  This argument would be sufficient if: (a) there is evidence in the records that Ashkouti actually did participate in the decisions; or (b) the evidence showed that he was so intertwined with Greenbriar and 2925 Properties' operations that a reasonable jury could hold him (like 2925 Properties), liable for contributory infringement.  But based on the record evidence presented, Ashkouti at very least is distinctly one step removed by virtue of Greenbriar's corporate structure.  Because of the thin record evidence and the corporate structure layers – though not all transparent – that Ashkouti created to protect himself and his family's interests, Plaintiff's evidence is not sufficient to create a triable issue as to whether Ashkouti had the requisite level of control to be held liable as contributing to the contributory liability of Greenbriar.

## III.  CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant Greenbriar Marketplace's Motion for Summary Judgment [Doc. 62] and **GRANTS** Defendant Albert Ashkouti's Motion for Summary Judgment [Doc. 82].  The

parties are **DIRECTED** to file their Consolidated Pretrial Order **NO LATER THAN NOVEMBER 15, 2016**.   The parties are **DIRECTED** to advise the Court **NO LATER THAN OCTOBER 24, 2016** of their estimated length of the trial for scheduling purposes.

**IT IS SO ORDERED** this 30th day of September, 2016.


**Amy Totenberg**
**United States District Judge**